IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
|     Plaintiff, | : |
| | : |
| v. | :   CASE NO: 7:20-cr-52-WLS-TQL-1 |
| | : |
| ERIC MORGAN BECK, | : |
| | : |
|     Defendant. | : |
| _____ | : |

## ORDER

Before the Court is Defendant's Motion to Suppress Illegally Obtained Evidence and Brief in Support (Doc. 39) ("Motion to Suppress") filed on behalf of Defendant Eric Morgan Beck ("Beck") on April 8, 2021. For the reasons stated herein, the Motion to Suppress is denied.

## I. BACKGROUND

On December 9, 2020, Defendant Beck was charged in a three-count Indictment with Count One: Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1); Count Two: Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and Count Three: Possession of a Firearm In Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. 924(c). (Doc. 1.) Beck was arraigned on January 12, 2021, before United States Magistrate Judge Thomas Q. Langstaff and ordered detained pending trial. (Doc. 21.) At his arraignment, Beck entered a plea of not guilty. (Doc. 28.)

Defendant Doris Davis ("Davis") is Beck's mother and co-defendant. The Indictment charged Davis with Possession with Intent to Distribute Methamphetamine in violation of 21

U.S.C. §§ 841(a)(1) and (b)(1)(C). A motion for severance has not been filed by either Defendant in this case.[1]

On July 22, 2020, four officers and investigators of the Drug Enforcement Team of Colquitt County Sheriff's Department ("CCSD") were patrolling together in an unmarked vehicle. The officers allege they saw a red Jeep Cherokee ("Cherokee") fail to stay in its lane and fail to stop at a stop sign. The officers contacted Georgia State Patrol Trooper Frank Gay ("Gay") who was in the area patrolling in a marked vehicle to assist them in stopping the Cherokee. Gay stopped the Cherokee which was being driven by Davis and in which Beck was a passenger. (Doc. 39 at 1-2.)

Three of the officers and investigators in the unmarked vehicle were Sergeant Randy Rakestraw ("Rakestraw"), Investigator Channing McDowell ("McDowell"), and Investigator Justin Searcy ("Searcy" and together with Rakestraw and McDowell, the "Officers"). Also present at the traffic stop were two additional officers with the CCSD, Sergeant Jeff Faircloth ("Faircloth") and Investigator Ivan Folsom ("Folsom") who were traveling in a separate vehicle.[2]

Although Davis, as the driver of the Cherokee gave the Officers permission to search the vehicle, Beck contends Gay did not have probable cause to stop and detain the vehicle and that the Officers illegally searched the vehicle. (Doc 39 at 1.) During the search, a gun was located in the back floorboard of the Cherokee. The Officers also recovered methamphetamine that was in a carton of cigarettes that Beck handed to Davis as he was being arrested and handcuffed. Beck asserts that "[a]ny physical evidence seized as a result of the illegal stop and search or any custodial statements obtained post-arrest are therefore inadmissible at any trial of this case." (*Id.*) Beck requested a hearing on the Motion to Suppress, which the Court held on May 25, 2021. Following the hearing, the Parties were

---

[1] At the detention hearing on January 12, 2021, Defendant Beck was serving a state sentence and agreed to federal detention at that time. Defendant has the right to seek a detention hearing if the state sentence is terminated or otherwise resolved. (*See* Order Doc. 21.) Defendant Davis was released on a $15,000 unsecured bond. (Doc. 31.j)

[2] Lieutenant Newman, with the Drug Unit was also present at the scene of the traffic stop. Other than his presence at the scene, the record does not reflect further action by Newman. It is unclear whether he was traveling in the vehicle with Searcy, McDowell and Rakestraw or whether he was in the vehicle with Folsom and Faircloth. (Tr. 68:6—7, 20—25.)

2

given additional time to prepare post-hearing briefs subject to the hearing transcript's availability on the record. (Doc. 45.) The hearing transcript was made available on August 31, 2021 (Doc. 52).

After continuances requested by the Parties and allowed by the Court, Beck's post-hearing brief (Doc. 59) was filed on October 18, 2021, and the Government filed its post-hearing brief (Doc. 60) on November 8, 2021. Beck did not file a reply brief within the seven-day deadline of November 15, 2021.

## II. EVIDENCE ADDUCED AT HEARING ON MAY 25, 2022

Approximately two weeks prior to the July 22, 2020 traffic stop that resulted in Beck's arrest and indictment, Rakestraw and Searcy were patrolling in an unmarked Tahoe in Moultrie when Rakestraw observed a red Jeep Cherokee being driven by Beck. (Tr. 7:17—22; 10:3—5.) Beck and Rakestraw were familiar with each other, and the CCSD had received multiple complaints that Beck was involved in selling stolen guns, dealing methamphetamine, and distributing illegal narcotics in and around Moultrie and Colquitt County. (Tr. 7:17—8:24.) When Beck saw Rakestraw, Beck drove away at a speed "[w]ell over 80 miles an hour" in a 35 mile per hour speed zone. (Tr. 8:14—16.) Due to the time of day, congestion in the area, and the neighborhood, Rakestraw and Searcy chose not to pursue Beck because of safety concerns with conducting a high speed chase as that time. (Tr. 8:5—16.)

On July 22, 2020, Rakestraw and Searcy were patrolling again in Moultrie in the unmarked Tahoe along with McDowell when Rakestraw saw the same Cherokee that had evaded them earlier that month. The Officers could not identify who was driving the Cherokee, but they were able to observe that there were two occupants in the vehicle. (Tr. 9:19—10:9.) Rakestraw testified that they observed the Cherokee make multiple traffic violations including failing to maintain lane and rolling a stop sign. (Tr. 14:23—15:1.) McDowell contacted Gay for assistance in making a traffic stop because Gay was in a marked vehicle and was in the area. According to Rakestraw, if a marked vehicle is in the area, it is common procedure to enlist the assistance of that official because it is safer to make a traffic stop in a marked vehicle. (Tr. 15:12—16:10.)

3

Gay's vehicle was equipped with a traffic video cam which Gay activated when McDowell contacted him for assistance with the traffic stop.[3] Davis promptly pulled over in response to Gay's flashing lights. The Officers arrived at the scene at about the same time as Gay and two of the Officers approached the vehicle with Gay. The first thing Gay did on approaching the vehicle was to request that Davis turn off the ignition and hand him the keys. The keys were dropped into the back floorboard area of the Cherokee and after they were retrieved, Gay introduced himself, viewed Davis's driver's license, advised her of the reason he stopped her, and then asked her to exit the vehicle. When questioned by Beck's counsel as to why Gay asked Davis to get out of her car, Gay testified he made the request because when he was talking to her while she was inside the car

> [S]he was very fidgety, she dropped her keys in the back after [he] asked her to take them out of the ignition. She was very fidgety. So I wanted to get her out and talk to her one-on-one, to see if she was impaired by any substance that would make her less safe to operate a vehicle on the State of Georgia roads.

(Tr. 31:24—32:5.)

On the Court's review of the traffic cam video, when Gay approached the vehicle and asked Davis to take the keys out of the ignition and hand them to him, it took Davis approximately 10 seconds to comply with the request. (Video time 5:10 to 5:20) The video shows that once Gay had the keys in his hand, he attempted to place them on top of the vehicle. However, the roof hatch was open, and it was Gay—not Davis—that dropped the keys into the back of the vehicle. (Video time 5:20 to 5:44) The video shows that Gay apologized for dropping the keys in the back and asked Davis if she wanted him to assist her and look in the back for the dropped keys. She allowed him to do so. Gay located the keys while shinning his flashlight in the back seat floorboard of the Cherokee and Ms. Davis retrieved the keys. When Davis started to hand the keys back to Gay, he told her to keep them, that he merely wanted the keys out of the ignition. (*Id.*) The video reflects that Gay

---

[3] The first 5:00 minutes of the video show Gay about to stop another vehicle when he receives McDowell's call. Gay lets the stopped vehicle leave and talks to McDowell regarding the Cherokee, the prior evasion, the request for his assistance, the traffic violations, and directions to intercept the Cherokee. Gay intercepts the Cherokee 4:21 into the video, and Davis pulls over at 4:41 in the video. After reading his location and the Cherokee's license plate number into the radio, Gay exited his vehicle at 5:00 in the video and first reaches the Cherokee and speaks to Davis at 5:10 in the video.

4

talked to Davis for an additional 29 seconds, during which time he viewed her driver's license, which she handed to him promptly when requested, advised her of the reason he stopped her, and then asked her to exit the vehicle. (Video time 5:49 to 6:18.)

After Davis exited the vehicle, Gay had her walk back to the front of his patrol car at which time he asked her if she was under the influence of anything, and Davis indicated she was taking medications for high blood pressure, diabetes, and heart problems. When asked about pain pills, hydrocodone or similar medicines, Davis replied she did not take any of those type medications. Davis stated she did not use "meth" and when asked by Gay, advised that there were no drugs in her car. (Tr. 32—33, Video time 6:30 to 7:37.)

McDowell was one of the Officers that approached the Cherokee with Gay. McDowell testified that after Gay stopped the vehicle, McDowell went to the passenger side of the vehicle and observed Beck pushing something down between his seat and the center console. (Tr. 42:11—21; 50:19—24.) When asked what he was shoving into the seat, Beck responded to McDowell that he was not shoving anything but was trying to grab some cigarettes. (*Id.*)

While Gay was talking to Davis, Searcy approached and joined the conversation. Searcy also asked Davis whether there were any drugs, guns, or large amounts of U.S. currency in her car. (Tr. 33:10—20; 58:1—6.) When Davis responded there were no drugs in the car, Searcy asked if Davis minded if he checked the vehicle. (Tr. 33:21—24.) Although Davis's answer was not a clear "yes" or "no," when told she needed to give a clear "yes" or "no" answer, she motioned toward her car and stated she did not care if they searched her vehicle. Although Davis did not articulate "yes" or "no," the Officers took Davis's motions as permission for the search. (Tr. 34:4—24; 59:1—11.)

When asked why he wanted to search the vehicle, Searcy testified the tips received by CCSD regarding Beck's involvement in selling stolen guns, dealing methamphetamine, and distributing illegal narcotics in and around Moultrie and Colquitt County played a part in Searcy requesting consent to search the vehicle. (Tr. 71.) In addition, Beck's activity in appearing to reach or push something in between the seat and console drew interest in searching the vehicle (Tr. 71:15—24). Further, because Gay was concerned about Davis being impaired, Searcy believed "there's possible impairment onboard [the vehicle], as well" (Tr. 69:23—70:1). In summarizing on redirect, Searcy indicated he asked for permission to search

5

the vehicle because he had a suspicion that the vehicle had been used for criminal activity based on the tips received, the prior flight, and Beck's movements in the vehicle when it was stopped. (Tr. 77:23—78:6.)

After Davis consented to the search, Beck willingly got out of the vehicle at McDowell's request. Beck went over and stood with his mother and Gay while the Officers conducted the search of the vehicle. McDowell searched the front seat area where Beck had been sitting but did not find anything of evidentiary value. (Tr. 43:3—23.)

Searcy testified that as he was

> [W]alking up to the rear of the backseat passenger compartment of the vehicle [he] observed a leather holster . . . with a gun inside of it, and it was right at the crease of the center console . . . and the passenger seat, as if it had come through that crack. It was actually sitting on top of debris inside the vehicle, and I don't remember what the debris was."

(Tr. 60:2—9.) The Officers knew Beck was a convicted felon, and at that point, Folsom walked over to Beck and placed him under arrest as a convicted felon (Tr. 60:20—23.) At the hearing, Beck introduced two photographs of the backseat floorboard area of the vehicle and asked Searcy to mark the area where he located the gun. No evidence was introduced showing the actual gun in the backseat floorboard.

Faircloth testified that when Beck was placed under arrest, Faircloth saw him hand off two packs of cigarettes to Davis. (Tr. 80:20—23.) Faircloth approached Davis and asked her to give him the packs of cigarettes, and she gave them to Faircloth. (Tr. 81:1—15.) One of the packs was unopened and still factory sealed. (Tr. 81:13—14.) The second pack was opened and inside that pack was what appeared to be methamphetamines which Faircloth gave to the Officers. (Tr. 81:2—6, 16—23.) Faircloth stated that no one objected when he asked Davis to give him the cigarettes. (Tr. 82:24—83:1.)

In the end, Davis was given a warning and allowed to leave the scene in the Cherokee (Tr. 26:7—14) and Beck was placed under arrest (Tr. 60:20—23).

### III.   LAW AND ANALYSIS

The Fourth Amendment of the United States' Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable *searches* and *seizures*, shall not be violated, and no Warrants

6

shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added). "The Supreme Court 'uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action.'" *United States v. Jones*, 184 Fed. App'x 943, 947 (11th Cir. 2006) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

A court must consider the totality of the circumstances in determining whether a person has standing to challenge a search or seizure. *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987) ("Whether an individual possesses a constitutionally protected privacy interest depends upon the totality of circumstances.") (citations omitted).

**A.     Beck has standing to contest the validity of the stop.**

"A person is seized by the police and thus entitled to challenge the government's actions under the Fourth Amendment when the officer, by means of physical force or show of authority terminates or restrains his freedom of movement." *Brenlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations marks omitted) (citations omitted).  In *Brenlin*, the Supreme Court clearly and directly addressed the question of whether a passenger in a vehicle is "seized" within the meaning of the Fourth Amendment at the time the vehicle is stopped by the police.  In resolving the question, the Court asked:

> [W]hether a reasonable person in [passenger's] position when the car [is] stopped would have believed himself free to terminate the encounter between the police and himself. . . .
>
> A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on privacy and personal security does not normally (and did not here) distinguish between passenger and driver. . . .
>
> It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety.

*Brendlin*, 551 U.S. at 257-58 (alterations adopted) (internal quotation marks omitted) (citations omitted).  The Supreme Court determined that "Brenlin [the passenger] was seized from the

7

moment [the driver's] car came to a halt on the side of the road, and it was error to deny his suppression motion on the ground that seizure occurred only at the formal arrest." *Id.* at 263.

Here it is clear that Beck would not have been permitted to just get out of the Cherokee and leave the scene.  It is also clear that Beck did not believe he was free to leave the scene.  Accordingly, the Court finds that Beck has standing to contest whether Gay had probable cause to effect the traffic stop.

**B.     The Officers and Gay had probable cause to stop the vehicle.**

"A traffic stop… 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry [v. Ohio*, 392 U.S. 1 … (1968)].'" *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (alterations in original) (citation omitted); *United States v. Whitlock*, 493 F. App'x 27, 30 (11th Cir. 2012) ("[T]he decision to stop an automobile is [generally] reasonable where the police have probable cause to believe that a traffic violation has occurred.") (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)).  "Law enforcement may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude[s] of applicable traffic and equipment regulations relating to the operation of motor vehicles." *Spoerke*, 568 F.3d at 1248 (internal quotation marks omitted) (citation omitted).  "The proponent of a motion to suppress has the burden to allege, and if the allegations are disputed, to prove, that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Jackson*, 618 F. App'x 472, 474 (11th Cir. 2015).

The Government contends that Gay and the Officers had two independently sufficient bases to stop the Cherokee.  First, the traffic violations observed by the Officers was sufficient for Gay to make the initial stop.  Second, the Government contends that the Officers had a duty to investigate Beck based on his previous flight from them, coupled with the complaints of Beck's criminal activities that had been received by CCSD.  (Doc. 42 at 4.)

With respect to stopping the Cherokee because of a traffic violation, Beck attempts to muddy the waters with accusations that the Officers' testimony is not credible.  Beck asserts that Gay did not have probable cause to make the stop because Gay had not seen the alleged traffic violations.  Beck further asserts that the lack of video of the traffic violations and the Officers' alleged anger because he previously evaded them should be taken into account in

8

assessing the Officers' testimony and credibility. Beck did not provide any evidence that the Officers were angry or that their testimony regarding the traffic violations was false. Nor did he provide any authority that one officer cannot rely on the statements of a fellow officer to establish probable cause for a traffic stop. In fact, Beck states: "In the initial review, Trooper Gay is constitutionally allowed to consider information gathered by other law enforcement officers 'involved in a common investigation.'" (Doc. 59 at 6 (quoting *United States v. Goddard*, 312 F.3d 1360, 1363-64 (11th Cit. 2002)). *Cf. United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.") (internal quotation marks omitted) (citation omitted).

Beck also contends that the alleged traffic violations were a pretext for the stop so the Officers would have a chance to search the Cherokee. In *Whren v. United States*, 517 U.S. 806, 813 (1996), the Supreme Court declined to adopt Whren's argument that "constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." Rather, the Court reviewed prior cases, stating:

> Not only have we never held, outside the context of inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary. In *United States v. Villamonte–Marquez*, 462 U.S. 579, 584, n.3, 103 S. Ct. 2573, 2577, n.3, 77 L. Ed. 2d 22 (1983), we held that an otherwise valid warrantless boarding of a vessel by customs officials was not rendered invalid "because the customs officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana." We flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification. In *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), *we held that a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was "a mere pretext for a narcotics search,"* id. at 221 n.1, 94 S. Ct. at 470 n.1; and that a lawful postarrest search of the person would not be rendered invalid by the fact that it was not motivated by the officer-safety concern that justifies such searches, *see id.* at 236, 94 S. Ct. at 477. *See also Gustafson v. Florida*, 414 U.S. 260, 266, 94 S. Ct. 488, 492, 38 L. Ed. 2d 456 (1973). And in *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723, 56 L. Ed. 2d 168 (1978), in rejecting the contention that wiretap evidence was subject to exclusion because the agents conducting the tap had failed to make any effort to comply with the statutory requirement that unauthorized acquisitions be

9

> minimized, we said that *"[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional."*

*Whren*, 517 U.S. at 812–13 (emphasis added).  Afterwards, the Supreme Court reiterated its position that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*  Therefore, so long as Gay had probable cause for the traffic stop, any ulterior motive by the Officers to provide Gay with a legitimate traffic violation for purposes of the stop, is irrelevant.

Beck cites *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) in support of his statement that "[a]s the Court is aware, pretextual traffic stops are impermissible."  However, Beck neglects to point out that in *Edmond*, the Supreme Court specifically distinguished *Whren* from the fact situation in *Edmond*.  Likewise, this case is far from the situation in *Edmond* where the City of Indianapolis set up roadblocks to stop all vehicles, without individualized suspicion or traffic violation, so a narcotics-detection dog could be walked around the outside of each stopped vehicle.[4]  *Id.* at 45-46.  The Supreme Court found that the City of Indianapolis was using its roadblock program for purposes of general crime control. *Id.* at 44-46.  The Supreme Court "caution[ed] that the purpose inquiry in this context is to be conducted only at the programmatic level [such as where law enforcement authorities use roadblocks or checkpoints] *and is not an invitation to probe the minds of individual officers acting at the scene. Cf. Whren, supra.*"  *Edmond*, 531 U.S. at 48 (emphasis added).

Further, Beck's reliance on *United States v. Tapia*, 912 F.2d 1367, 1369, n.1 (11th Cir. 1990) for his position that pretextual traffic stops are impermissible is also misplaced.  *Tapia*, cites Eleventh Circuit cases holding that the "proper inquiry for determining whether [a] stop is pretextual is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *Id.* (emphasis in original) (internal quotation marks omitted) (citation omitted).  However, *Tapia* and the cases cited in footnote 1 therein, were all decided prior to the Supreme Court's decision in *Whren*.  As such, to the extent those decisions find that a

---

[4] The Supreme Court reviewed other cases in which it had allowed roadblocks where the motives of the officers could be evaluated and also distinguished those cases from *Edmond*, because the roadblocks in those cases were related to problems of policing the border or were appropriately tailored to emergency situations such as to thwart an imminent terrorist attack or to catch a dangerous criminal likely to flee by a particular roadway. *Edmond*, 531 U.S. at 41, 44.

10

traffic stop based on valid probable cause may be set aside because individual officers acting at the scene may also have had other motives for the stop, are all contrary to the holding in *Whren*. The test is "*whether probable cause existed to justify the stop*," not "whether a police officer, acting reasonably, *would* have made the stop for the reason given." *Whren*, 517 U.S. at 810, 818 (emphasis added) (so finding notwithstanding defendants' argument that expansive traffic laws are "so difficult to obey perfectly that virtually everyone is guilty of violation").

There is no evidence to support Beck's contention that the Officer's testimony as to the traffic violations is false. Further, because "great deference is given to the judgment of a trained law enforcement officer on the scene," the Court will defer to the Officers' judgment upon what they saw before the video recording began. *Whitlock*, 493 F. App'x at 29 (internal quotation marks omitted) (citation omitted). "For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure." *Whren*, 517 U.S. at 819.

Based on the above, the Court finds Beck failed to meet his burden of proof. Thus, the Court finds and concludes that the traffic stop was legal; i.e., based on probable cause.

### C. Extension of Traffic Stop

For a stop to remain lawful, it must be "reasonably related in scope to the circumstances which justified the interference in the first place" and "may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (internal quotation marks omitted) (citations omitted). "An officer may only prolong a traffic stop in special circumstances," such as: (1) "to investigate the driver's license and the vehicle registration," including by computer check, (2) in the interest of officer safety, to await the results of a criminal history check that is part of the routine traffic investigation, and (3) if he has "articulable suspicion of other illegal activity." *Id.* (internal quotation marks omitted) (citations committed). "During a lawful traffic stop, officers may also take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course." *Spoerke*, 568 F.3d at 1248 (internal quotation marks omitted) (citations omitted).

11

In *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir.), *cert. denied*, 143 S. Ct. 95 (2022), the Eleventh Circuit, sitting *en banc*, analyzed the Circuit's precedent as to the standard for addressing unlawfully prolonged traffic stops. The Eleventh Circuit stated:

> [C]ourts must look at what an officer actually does: if he can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission. And a traffic stop prolonged beyond that point is unlawful. Put simply, a stop can be unlawfully prolonged even if done expeditiously.
>
> . . .
>
> The proper standard for addressing an unlawfully prolonged stop, then, is this: a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes. In other words, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) *without reasonable suspicion*.

*Id.* at 883–84 (alteration adopted) (emphasis added) (internal quotation marks omitted) (citations omitted).

Beck accurately states that the "permissible scope of detention for a traffic offense is limited" (Doc. 39 at 3), and that the "stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity" (*Id.* (quoting *Boyce*, 351 F.3d at 1106)). However, Beck does not say how Gay unlawfully prolonged the traffic stop. Beck simply relies on his assertions that the testimony of the Officers and Gay is not credible, and that Gay stopped and detained Beck for pretextual reasons. Beck's "pretextual" argument has been addressed above.

In reviewing the video and the transcript of the hearing, the Court notes that Gay's testimony at the hearing as to why he had Beck exit the vehicle is not consistent with the video. As noted, Gay had Davis exit the vehicle because

> [S]he was very fidgety, she dropped her keys in the back after [he] asked her to take them out of the ignition. She was very fidgety. So I wanted to get her out and talk to her one-on-one, to see if she was impaired by any substance that would make her less safe to operate a vehicle on the State of Georgia roads.

(Tr. 31:24—32:5.) However, the video shows very clearly that within seconds of the request Davis removed the keys from the ignition and handed them to Gay. It was Gay who dropped the keys in the back of the vehicle through the open roof hatch. From the time he requested

the keys until he dropped them in the back seat, only 10 seconds elapsed. The video shows that Gay apologized for dropping the keys in the back and asked Davis if she wanted him to assist her and look in the back for the dropped keys. She allowed him to do so. Gay located the keys while shinning his flashlight in the backseat and floorboard area of the Cherokee and Davis retrieved the keys.

Once the keys were retrieved, the video reflects that Gay talked to Davis for only 29 seconds, during which time he viewed her driver's license (which was also promptly handed to him), advised her of the reason she was stopped, and then asked her to exit the vehicle.

As discussed above, an officer's motivation in making a traffic stop is irrelevant in determining whether a person's Fourth Amendment rights have been violated where the stop is initiated because of a traffic violation. However, "courts must look at what an officer actually does" during that stop. *Campbell*, 26 F.4th at 883.

The Court has reservations as to why an officer would question whether an individual is impaired within the first 68 seconds of a stop merely because she was "fidgety"—particularly where his testimony about the facts on which he based his statements that Davis was "fidgety" were totally inconsistent with the video. In addition, Gay did not indicate he smelled alcohol or other substance immediately on approaching the vehicle, he did not inquire before asking her to exit the vehicle whether she was intoxicated, and she promptly handed him car keys and a driver's license as requested. Even assuming Davis was fidgety, it is not unusual for a person stopped by a State Trooper to be nervous or fidgety.

> [T]he Supreme Court has noted that a traffic stop is an "unsettling show of authority" that may "create substantial anxiety." *Delaware [v. Prouse*, 440 U.S. 648, 657 (1979]. There is no reason why [Officer] should have reasonably suspected that [Defendant's] nervousness was tied to anything other than the fact that he was being momentarily detained by an authority figure with police power over him.

*United States v. Perkins*, 348 F.3d 965, 970. Similarly, the only action on which Gay based his statement that Beck was fidgety was his inconsistent testimony. Insofar as his assertion that he wanted to check to be sure Beck was not impaired, the video reflects that after she got out of the Cherokee, Gay spent about 62 seconds (Video 6:18 to 7:20) asking Davis about her medications and drug use. Gay did not request she walk a straight line, touch her nose, or take a breathalyzer test. There is no evidence, and the video does not reflect, that Gay called in for

13

a computer check on outstanding warrants. When Gay was asked what else he did to evaluate whether Davis was impaired after her brief initial discussion, he testified that "then I just listened to her talk from there on out, listening for slurred speech, other mannerisms that would tell me either she's on something, or she's off it and needing more." (Tr. 33:3—5.) The Court notes that the video does not reflect that Gay expressed any other concerns as to whether Davis was impaired.

The video reflects that Gay had completed questioning Davis when Searcy joined Gay in the conversation with Beck. Searcy quickly asks her for permission to search her vehicle. The request is little more than 3 minutes from the time Gay first approached the vehicle. After that time, Gay does not ask Davis any additional questions. The video further reflects that Searcy apparently noticed the gun in the back floorboard of the Cherokee within 30 seconds after Beck exits the vehicle.

Defendants were detained for approximately 12 minutes for the traffic stop and search of the vehicle. The Court finds that the actions of Gay and the other Officers overlapped and were near in time. Accordingly, the Court finds that the stop was not unduly extended, particularly in light of the Court's additional findings, *see infra* Section III.D., as to the Officers' reasonable suspicion of other illegal activity.

### D. The Officers had reasonable suspicion of other illegal activity justifying a prolonged traffic stop.

Under *Boyce*, a traffic stop based on a traffic violation, may be legitimately extended if an officer has "articulable suspicion of other illegal activity." *Boyce*, 351 F.3d at 1106 (internal quotation marks omitted) (citations committed). As noted above, the Eleventh Circuit provided further guidance on prolonging a traffic stop on suspicion of other illegal activity in *Campbell* where it stated: "[T]o unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion. *Campbell*, 26 F.4th at 884.

Here, the Government contends that the traffic stop was legal because the Officers had a duty to investigate Beck based on his previous flight from them, coupled with the complaints of Beck's criminal activities that had been received by CCSD. However, in this case, the Officers' cannot rely on this information for the stop itself because their testimony

14

at the suppression hearing is clear that prior to the stop, none of the Officers could identify whether Beck was even in the vehicle.

The question now is whether the combination of Beck's previous flight, the complaints of his criminal activities, and his actions during the traffic stop prior to authorization for the search provided reasonable suspicion of other legal activity to justify the extended stop. The Court finds that they do provide such suspicion.

In his own brief Beck essentially acknowledges that the Officers had reasonable suspicion of other illegal activities to prolong the stop. While attempting to discredit McDowell's testimony that he saw Beck attempting to hide or push something between his seat and the front console, Beck states:

> Officer McDowell testified that he had significant information about Mr. Beck as he approached the passenger window of the Jeep that night. He knew that Mr. Beck had multiple prior arrests and had been in and out of the local jail. (T.45) He knew that two weeks prior Mr. Beck had fled from other officers so recklessly that they did not pursue him out of concerns a chase would pose significant risks to bystanders. (T.44-45) He knew that Mr. Beck was suspected by multiple tipsters of selling significant quantities of illegal drugs in the area, as well as using them personally. (T.45) He knew that Mr. Beck was likely to be carrying a firearm that night. (T.46) If officer McDowell is to be believed, *then he clearly had sufficient information to believe that Mr. Beck was likely under the influence of drugs, was carrying a gun, and would have been worried about being arrested for illegal drug trafficking. It is well within this court's purview to find that someone suspected of those things would be reasonably considered dangerous by officers making an arrest.*

> But, beyond even those pre-interaction suspicions, officer McDowell testified that he saw Mr. Beck essentially hiding something in the seat cushion as officer McDowell approached him that night. It is here where officer McDowell's actions belie his words. Certainly, any officer who had the information about Mr. Beck's history and what he was currently suspected of would be wary of any approach to Mr. Beck. If, in those circumstances, that officer then saw Mr. Beck trying to hide something in between the seat cushions, *it would certainly be reasonable to assume it was contraband. And if he was known to carry a gun, it is certainly reasonable, and even prudent, to assume he was hiding a gun. Doing so seems to be the safest path forward for that officer.*

> Any reasonable officer would then take immediate steps to protect himself and others from the danger of someone with Mr. Beck's alleged profile from having access to a gun as he was being arrested. Those steps could include instructing Mr. Beck to place his hands on the dashboard of the Jeep and not move them or to get Mr. Beck out of the Jeep immediately and thus away from

whatever he was hiding in the seat cushion. But that is not what officer McDowell did.

(Doc. 59 at 13-14 (emphasis added).) Beck contends that McDowell's testimony that he observed Beck attempting to hide something is not credible because McDowell did not take the steps which Beck contends any reasonable officer would have taken in such circumstances. Again, Beck did not present any evidence to support his assertions. McDowell testified that when asked what he was hiding, Beck replied that he was only reaching for cigarettes. When Beck got out of the vehicle, he passed cigarettes to Davis. This action could easily support McDowell's statements that he saw Beck twisting around and pushing (or pulling as Beck's statement implies) something between his seat and the console. Further, Beck did not provide evidence from other officers outside of McDowell's unit as to what they would consider reasonable, and neither Beck nor Davis testified that Beck was not pushing or pulling anything between the seat and console.

> Therefore, on finding that McDowell's testimony is credible, then, Beck admits that:
>
> McDowell . . . clearly had sufficient information to believe that Mr. Beck was likely under the influence of drugs, was carrying a gun, and would have been worried about being arrested for illegal drug trafficking. It is well within this court's purview to find that someone suspected of those things would be reasonably considered dangerous by officers making an arrest.
>
> . . . If, in those circumstances, that officer then saw Mr. Beck trying to hide something in between the seat cushions, it would certainly be reasonable to assume it was contraband. And if he was known to carry a gun, it is certainly reasonable, and even prudent, to assume he was hiding a gun. Doing so seems to be the safest path forward for that officer.

(Doc. 59 at 13-14.) Based on his own statements, the Officers had reasonable suspicion that Beck, a convicted felon, may be in possession of an illegal firearm or drugs. As such, and as shown by the totality of the circumstances, they had a reasonable suspicion and articulable basis on which to prolong the valid traffic stop to search the Cherokee.

### E. The search of the Cherokee was legal.

The Government contends that Beck does not have standing to challenge the validity of the search of the Cherokee. Beck was sitting in the passenger seat of the Cherokee that was being driven by his co-defendant and mother, Davis. There is no evidence in the record that Beck has an ownership interest in the Cherokee. In *Rakas v. Illinois*, 439 U.S. 128 (1978),

the Supreme Court stated that "the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure . . . belongs more properly under the heading of substantive Fourth Amendment doctrine [rather] than under the heading of standing." *Id.* at 140. The Court further stated:

> Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections. There is no reason to think that a party whose rights have been infringed will not, if evidence is used against him, have ample motivation to move to suppress it.

*Id.* at 133–34 (1978) (internal quotation marks omitted) (citations omitted) (footnote omitted).

Beck does not assert he has a property interest in the Cherokee. Rather, as prohibited by *Rakas*, he is attempting to invalidate the search by professing to advocate on behalf of Davis by alleging that her rights were violated. Beck makes allegations as to Davis's lack of knowledge, her statements, and mental state, by contending that she did not know she had a right to refuse to allow a search and that she did not consent, but merely acquiesced, to Searcy's request because she expected that the Officers were going to do what they wanted to do and search anyway. (Doc. 59 at 3, 9, 11)

First, Davis has counsel to represent her interests in this case. "There is no reason to think that a party whose rights have been infringed will not, if evidence is used against [her], have ample motivation to move to suppress it." *Id.* at 134. Interestingly, Davis has not contested the validity of the stop, nor has she contested the validity of the search. Beck was still in the Cherokee when Davis gave consent to the search. He does not assert he was able to hear any of the conversation between Davis and Gay or between Davis and Searcy. Nor did he call Davis as a witness so she could testify whether Beck's assertions are true. Nothing in the record shows that Davis was not available to testify at the hearing on the Motion to Suppress. Thus, the testimony of Gay and the Officers and the video cam of the stop are the only evidence available to the Court. The Court reviewed the video several times, and it reflects that Davis gave consent for the Officers to search her vehicle. Consistent with a

17

voluntary consent, Davis's actions on the video do not reflect that she was upset by the search. In fact, Davis engaged in congenial discussions with Gay and some of the Officers during the search, even laughing at times

The Officers had valid permission from Davis to conduct a search of the Cherokee.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons based upon the totality of the circumstances as shown by the evidence presented, Defendant Beck's Motion to Suppress (Doc. 39) is **DENIED.**

**SO ORDERED**, this 10th day of January 2023.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**